IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TRACY L. JIROUSEK, | ) | CASE NO. 1:16-cv-01221 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Tracy L. Jirousek ("Plaintiff" or "Jirousek") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 18.   As explained more fully below, the Court

**AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Jirousek protectively filed an application for Disability Insurance Benefits ("DIB") on

November 30, 2012.[1]  Tr. 18, 69, 151, 169.   Jirousek alleged a disability onset date of February

1, 2006 (Tr. 18, 151, 169), which she later amended to November 1, 2012 (Tr. 18, 38-39, 168).

Jirousek alleged disability due to neck pain and stiffness, low back pain, shoulder pain, arm

numbness and tendency to drop things, headaches, depression (low energy, irritable), insomnia

due to pain, impaired concentration, very slow pace due to pain and stiffness, side effects from

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 5/12/2017).

medication, needs sit/stand/walk/recline, and limited reaching.  Tr. 69-70, 95, 103, 180.

Jirousek's application was denied initially (Tr. 95-101) and upon reconsideration by the state

agency (Tr. 103-109).   Thereafter, she requested an administrative hearing.  Tr. 110.

On February 26, 2015, an administrative hearing was conducted by Administrative Law

Judge Susan Giuffre ("ALJ").  Tr. 35-68.   On April 6, 2015, the ALJ issued her decision.  Tr.

15-34.  In her decision, the ALJ determined that Jirousek had not been under a disability within

the meaning of the Social Security Act from November 1, 2012, through March 31, 2013, her

date last insured.  Tr. 18, 30.  Jirousek requested review of the ALJ's decision by the Appeals

Council.  Tr. 14.  On March 22, 2016, the Appeals Council denied Jirousek's request for review,

making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.      Personal, vocational and educational evidence

Jirousek was born in 1969.  Tr.  151.  She completed high school and obtained a

certificate from a medical massage school.  Tr. 41-42.  However, she never used her medical

massage certificate.  Tr. 42.  Jirousek last worked full time in 2006 as a bartender/waitress at

Henry's Bar.  Tr. 42.  From 2006 until 2009, Jirousek filled in at Henry's Bar.  Tr. 42.  Jirousek

lives in a house with her husband and her two minor children.  Tr. 45, 46.  At the time of the

hearing, her children were ages nine and five.  Tr. 46.

### B.      Medical evidence[2]

#### 1.      Treatment history[3]

---

[2] Jirousek's challenges relate to her physical rather than mental impairments.  Accordingly, medical evidence
summarized herein relates primarily to Jirousek's physical impairments.

[3] In making a determination regarding Jirousek's disability claim, the ALJ considered evidence pre-dating
November 1, 2012, Jirousek's amended alleged onset date, and post-dating March 31, 2013, her date last insured.
Tr. 22-28.  Accordingly, the evidence summarized herein includes treatment received prior to the amended alleged
onset date and after the date last insured.

Starting in 2005, Jirousek received chiropractic treatment from Gregory R. Poyle, D.C. Tr. 231-243. Jirousek's complaints included neck and back pain and tingling in her hands/wrists. Tr. 234, 237, 238, 241, 242. She continued treatments with Dr. Poyle through 2007. Tr. 232-243.

On October 25, 2007, upon referral of Douglas Potoczak, M.D., Jirousek's primary care physician since 2006 (Tr. 592), Jirousek saw Sanjay Kumar, D.O., of Neurosurgical Services, Inc., for a consultation regarding her pain (Tr. 392-393). Jirousek was reporting some neck pain and pain going down the arm with numbness and tingling into the thumbs since May or June of 2007. Tr. 392. Jirousek's pain was present with turning and twisting and sometimes her pain level was a 7/10. Tr. 392. Jirousek had been taking Vicodin, which helped minimally. Tr. 392. Jirousek was recently pregnant so she had stopped taking her medicines except for Tylenol as needed. Tr. 392. She had tried a prednisone taper but it did not help. Tr. 392. On physical examination, Dr. Kumar noted that extension and flexion caused some pain in the neck area; there was mild pain to palpation over the right mid lower cervical paraspinal muscles; and spurling maneuver caused some mild radiating pain down the right arm. Tr. 392. Dr. Kumar noted that Jirousek described "some paresthesias in the C6 distribution." Tr. 392. Dr. Kumar observed that Jirousek's reflexes were 2+ and symmetric; there were no upper motor neuron signs or symptoms seen; strength was at least 5/5 in the upper extremities; gait was normal; and there were no obvious spinal deformities noted. Tr. 392. Dr. Kumar indicated that a September 27, 2007, MRI showed generalized disk bulging at C4-C5, C5-C6 and C6-C7, greatest at C6-C7, with no stenosis. Tr. 392. Dr. Kumar's impression was right-sided neck pain with pain going down the arm likely secondary to C6 radiculitis with mild disk bulging. Tr. 393. Because of

Jirousek's pregnancy, treatment options were limited. Tr. 393. Jirousek indicated she had tried chiropractic manipulations and traction which had been helping. Tr. 393.

In November 2007, approval was obtained from Jirousek's OB/GYN to proceed with injections. Tr. 391. On December 11, 2007, Jirousek reported that the right C5-C6, C6-C7 facet injection helped for about a week. Tr. 389. She was still having some numbness and tingling in her thumb and index finger and sometimes pain in the parascapular region and shoulder blade and neck. Tr. 389. Jirousek had experienced a miscarriage and was taking Vicodin at night. Tr. 389. Nerve conduction studies were performed and Dr. Kumar concluded that there appeared to be electrodiagnostic evidence of mild right-sided carpal tunnel syndrome characterized by sensory fiber demyelination. Tr. 389. Dr. Kumar recommended carpal tunnel wrist splints and a cervical epidural injections. Tr. 389.

Several weeks after receiving the cervical epidural injections, on December 31, 2007, Jirousek saw Dr. Kumar for follow up reporting that the injections had helped significantly. Tr. 387. Most of her pain was now in the low back right side. Tr. 387. Her pain was worse with bending and standing and sometimes it was hard to get out of bed. Tr. 387. She was taking Vicodin and Tylenol rarely. Tr. 387. On examination, Dr. Kumar observed some tenderness over the right lumbosacral junction and SI region. Tr. 387. Flexion bothered Jirousek more than extension. Tr. 387. Otherwise, she was neurologically stable. Tr. 387. Dr. Kumar recommended x-rays of the lumbar spine and SI joints. Tr. 387. Jirousek was going to continue her home exercise program and see Dr. Kumar in two weeks for follow up. Tr. 387.

During a January 11, 2008, follow up visit with Dr. Kumar, Jirousek reported that her neck was still feeling pretty good but she was having low back pain, with her pain worse with lying down. Tr. 385. The x-rays showed some posterior element sclerosis in mid distal lumbar

spine and arthritic changes at the bilateral SI joints, right greater than left.  Tr. 385.  Jirousek was

taking Vicodin and Tylenol only as needed and she reported that her pain interfered with her

activities of daily living and quality of life.  Tr. 385.  Dr. Kumar recommended an MRI since

lying down made her symptoms worse.  Tr. 385.

During a January 25, 2008, Dr. Kumar indicated that the MRI showed a broad base disk

bulge at L4-L5, a small central disk protrusion at L5-S1, and bilateral mild facet arthropathy.  Tr.

383.  Jirousek's back hurt with extension but her neck pain was stable.  Tr. 383.  Jirousek was

taking medicine only as needed.  Tr. 383.  She was walking "twice a day 3 miles" which Jirousek

felt helped her.  Tr.  383.  The plan was for Jirousek to continue her home exercise program with

some flexion oriented exercises.  Tr. 383.  It was decided that Jirousek would hold off on

injections and Dr. Kumar directed Jirousek to call if she had any flare ups.  Tr. 383.

On May 2, 2008, Jirousek saw Dr. Kumar reporting that her pain was worse and she

could not take it anymore.  Tr. 381.  She wanted injections.  Tr. 381.  Dr. Kumar agreed to

schedule L4-L5, L5-S1 facet joint injections first.  Tr. 381.  Dr. Kumar prescribed both Vicodin

and Naprosyn.  Tr. 381.  On May 21, 2008, Jirousek saw Dr. Kumar and reported that her pain

was significantly better following the facet joint injections performed two weeks prior.  Tr. 379.

Jirousek indicated that she felt "awesome[.]" Tr. 379.  She did indicate that sometimes she still

had issues with her neck.  Tr. 379.  Dr. Kumar was happy with Jirousek's results and indicated

that he would see Jirousek back if she had any flare ups.  Tr. 379.

On July 7, 2008, Jirousek returned to see Dr. Kumar reporting that the pain in her neck

had returned with numbness in her arms, limited range of motion and some spasms.  Tr. 377.  Dr.

Kumar recommended epidural injections and physical therapy thereafter.  Tr. 377.   On July 30,

2008, Jirousek reported 80% relief from her cervical epidural injections.  Tr. 375.  Jirousek

inquired about cervical traction.  Tr. 375.  On examination, Dr. Kumar observed minimal pain to palpation over the neck and lower back paraspinal muscles.  Tr. 375.  Jirousek's range of motion and strength were functional, her sensation was intact to light touch, and neurologically she was stable.  Tr. 375.  Dr. Kumar recommended comprehensive outpatient therapy and a cervical traction unit that she could use at home.  Tr. 375.

Jirousek next saw her primary care physician Dr. Potoczak on February 8, 2010, for follow up of her chronic neck and shoulder pain, which Jirousek described as slightly worse.  Tr. 293.  Jirousek indicated that her shoulder pain had started last summer and was continuing to bother her but it was not interfering with daily activities.  Tr. 293.  Jirousek indicated that she "[f]elt a pop and some clicking last summer in the pool with [her] daughter.  She threw her up into the air playing with her."  Tr. 293.  On examination, Dr. Potoczak observed pain and tenderness over the biceps; "decreased range of motion, flexion, extension, rotational movement[;]" some pain over supraspinatus; trapezius muscle and paracervical muscular spasm and pain with palpation; mild decreased range of motion; flexion and extension, lateral bending secondary to pain; no parasthesias in arms; good grip strength; some lumbar discomfort, worse when on her feet a lot; and negative straight leg raises.  Tr. 293.  Dr. Potoczak's diagnoses included chronic lumbar pain; sciatica with intermittent exacerbation; and chronic shoulder pain, cannot rule out rotator cuff tear.  Tr. 293.  An x-ray of Jirousek's right shoulder taken on February 8, 2010, showed mild degenerative changes.  Tr. 324.  Dr. Potoczak indicated that the x-ray was negative but noted that an MRI might be required.  Tr. 293.  Dr. Potoczak prescribed steroids for 11 days; recommended heat in the morning and ice at night; and Vicodin every 6 hours as needed.  Tr. 293.  An MRI of the right shoulder taken on March 1, 2010, showed "No rotator cuff abnormality identified.  Acromioclavicular degenerative changes."  Tr. 322.

The following month, on March 31, 2010, Jirousek returned to see Dr. Kumar almost two years since her last visit with him. Tr. 320, 372. Jirousek complained of right sided low back pain. Tr. 320. Jirousek indicated that her back pain had flared up on the right side. Tr. 320. She described her pain as a dull ache and reported that bending and lifting bothered her. Tr. 320. Jirousek rated her pain as a 4/10. Tr. 320. She had minimal numbness down her right leg. Tr. 320. She was taking Vicodin as needed, three or four time per week, and Skelaxin, Motrin and Tylenol as needed. Tr. 320. Jirousek had started to jog. Tr. 320. She indicated that her pain affected her quality of life and her sleep was decreased. Tr. 320. Jirousek had another child about a year prior. Tr. 320. Dr. Kumar assessed low back pain with degenerative disk and joint disease of the lower lumbar spine with facet arthropathy, symptomatic on the right. Tr. 320. Dr. Kumar noted that Jirousek had done well with facet joint injections in the past and recommended L4-L5, L5-S1 facet joint injections. Tr. 320. On April 19, 2010, Jirousek reported to Dr. Kumar's office that she felt 75% better following her injections. Tr. 371.

On September 21, 2010, Jirousek saw Dr. Potoczak with complaints of intermittent problems with her back and neck. Tr. 287. She was interested in trying more muscle relaxant and needed a refill on Vicodin. Tr. 287. Dr. Potoczak observed pain and tenderness in the paracervical musculature and into the trapezius but she was improved since before. Tr. 287. Dr. Potoczak refilled Jirousek's medications with instructions to follow up in a month or sooner if her symptoms worsened. Tr. 287.

Jirousek saw Dr. Potoczak on July 27, 2011, complaining of muscle pain in her chest, shoulders and arms that had been going on for about a month. Tr. 284. Dr. Potoczak indicated that the muscle pain was possibly related to her use of Zocor, which she had been on for almost a year. Tr. 284. Dr. Potoczak diagnosed history of hyperlipidemia and chronic neck/back pain,

now with myalgias.  Tr.  284.  Dr. Potoczak discontinued the Zocor and recommended follow up

in two weeks.  Tr. 284.  During an August 12, 2011, follow-up visit with Dr. Potoczak Jirousek's

myalgias had improved slightly.  Tr. 283.  On examination, Jirousek's bicep area was not as

tender but she had continued pain in the paracervical musculature and trapezius bilateral with

muscle spasm, achiness in her upper deltoid and tricep, and some chronic low back pain and

paresthesias in the right buttock area.  Tr. 283.  Dr. Potoczak recommended keeping Jirousek off

the Zocor and noted that she was scheduled to see Dr. Kumar for an evaluation of lumbar

cortisone injections.  Tr. 283.  Dr. Potoczak planned to follow up with Jirousek in a month and

would see if Dr. Kumar felt that physical therapy was appropriate.  Tr. 283.

On August 17, 2011, Jirousek saw Dr. Kumar with complaints of right-sided low back

pain and neck pain.  Tr. 303, 369.  Jirousek had not seen Dr. Kumar for about 16 months.  Tr.

303.  Jirousek reported that her pain had returned over the prior three months on the right side of

her low back.  Tr. 303.  Her pain was worse with bending and twisting and the numbness,

tingling, and neck pain had returned on both sides but it was not as bad as her low back pain.  Tr.

303.  On examination, Dr. Kumar observed tenderness on the right mid lower lumbar paraspinal

muscles with positive facet joint provocative maneuvers; straight leg raising was negative;

Jirousek could heel and toe walk; gait, coordination and balance were normal; mild tightness in

her hamstrings; no pain with hip rotation; and neck range of motion was functional.  Tr. 303.  Dr.

Kumar assessed low back pain right sided with facet arthropathy and history of neck pain.  Tr.

303.  Dr. Kumar advised that Jirousek should proceed with right L4-5 and L5-S1 facet joint

injections.  Tr. 303.  If Jirousek's neck continued to bother her, Dr. Kumar indicated that

Jirousek may need interventional pain management.  Tr. 303.  Jirousek was continuing to do

exercises at home and they discussed the possibility of an inversion table and DRX machine,

which would be more for diskogenic pain.  Tr. 303.  Jirousek was going to continue to take Motrin and had enough Vicodin.  Tr. 303.  On September 6, 2011, Jirousek reported to Dr. Kumar's office that the injections she had on August 22, 2011, provided 75% relief but she still had some pain and wanted to know whether she should have another injection.  Tr. 368.  Dr. Kumar recommended holding off.  Tr. 368.

Jirousek saw Dr. Potoczak on November 8, 2011, for follow up after having discontinued the Zocor.  Tr. 420-421.  Jirousek had no chest pain, focal weakness or shortness of breath.  Tr. 420.  Jirousek was interested in restarting Zocor.  Tr. 420.  Dr. Potoczak provided a refill for the Zocor.  Tr. 422.  On examination, Dr. Potoczak observed multiple trigger points with deep muscle spasm.  Tr. 421.  Dr. Potoczak provided samples of Savella.  Tr. 422.  During a follow-up visit with Dr. Potoczak on November 22, 2011, Jirousek reported that pain was present in her neck, left clavicle, left elbow, left shoulder, right clavicle, upper right arm, upper left arm, upper back and right shoulder and she described her pain as "medium."  Tr. 422.  Jirousek reported that physical therapy was helping with her pain.  Tr. 423.  Jirousek was interested in a different muscle relaxer.  Tr. 423.  She had no improvement with Savella so Dr. Potoczak discontinued the medication.  Tr. 423.  Dr. Potoczak's physical examination revealed an unremarkable neurologic exam; upper and lower extremities within normal limits; and full strength.  Tr. 423.  Dr. Potoczak diagnosed fibromyalgia and he prescribed Flexeril to be taken 2 times daily as needed for muscle spasms.  Tr. 423.

On November 30, 2011, Jirousek saw a new chiropractor, Dr. Ross C. Lubrani, DC, for evaluation and treatment of her neck and lower back pain.  Tr. 245-247.  Jirousek complained of "very severe constant sharp neck pain, severe constant aching low back pain and moderate numbness in both arms."  Tr. 245.  Dr. Lubrani's objective findings included evidence of muscle

spasms, active myofascial trigger points, and range of motion loss. Tr. 247. Dr. Lubrani treated Jirousek through at least March 2012. Tr. 245-272.

During an April 11, 2012, visit with Dr. Potoczak regarding her anxiety, Dr. Potoczak noted in his physical examination findings that Jirousek had a normal range of motion and her back and neck pain were much better with therapy. Tr. 424. On May 8, 2012, Jirousek returned to see Dr. Kumar with complaints of bilateral shoulder pain that had been bothering her for the prior 6 months. Tr. 366. She also reported neck pain but her shoulders were really bad. Tr. 366. Both sides bothered her with lifting her arms and sleeping at night. Tr. 366. She had a hard time reaching behind her back. Tr. 366. Jirousek was using Vicodin sparingly and tried Motrin. Tr. 366. Dr. Kumar diagnosed bilateral shoulder pain with rotator cuff tendonitis and bursitis. Tr. 366. Dr. Kumar started Jirousek on Mobic; ordered x-rays of both shoulders; and scheduled bilateral shoulder subcromial injections. Tr. 366. During a visit at Dr. Kumar's office on May 30, 2012, Jirousek reported significant relief following bilateral shoulder subcromial injections earlier that month. Tr. 363. She had more relief while awake but was still having bad pain at night. Tr. 363. She was using Mobic and Tylenol, which seemed to help her perform her daily activities. Tr. 363. Because Jirousek was continuing to have significant discomfort in the evening, the nurse indicated that an MRI of the left shoulder would be taken to rule out any rotator cuff involvement. Tr. 363.

Following her left shoulder MRI (Tr. 354, 415-416), on June 27, 2012, Jirousek saw David Zanotti, M.D., of the Center for Orthopedics, for an evaluation of her shoulder pain (Tr. 337-338, 347). Jirousek reported that her right shoulder was worse than her left. Tr. 337. On examination, Dr. Zanotti observed that Jirousek had full overhead motion of both shoulders; very limited neck flexion and extension with pain radiating down both paracervical regions;

significant pain in the biceps groove on both sides; 5/5 abduction and supraspinatus strength with mild pain during stressing; pain with impingement maneuvers on both sides; and subscapularis stretching caused significant discomfort on both sides. Tr. 337. Jirousek denied any numbness or tingling during the visit but reported having radiating pain down her arms at times. Tr. 337. Dr. Zanotti indicated that x-rays of both shoulders showed minimal degenerative changes of the glenohumeral joint with the alignment maintained and an MRI of the left shoulder showed subluxated biceps tendon with some cuff tendinitis. Tr. 337, 354, 415-416. Dr. Zanotti assessed right greater than left shoulder biceps tendinitis with left sided bicipital subluxation and bilateral impingement and a history of cervical radiculopathy. Tr. 338. An MRI of the right shoulder was ordered and Dr. Zanotti administered an injection of Celestone and Lidocaine in the left bicipital groove. Tr. 338.

A July 2, 2012, MRI of the right shoulder showed distal supraspinatus and infraspinatus with partial undersurface tearing of the distal anterior fibers of the supraspinatus without full-thickness tear; moderate AC joint osteoarthrosis with inferior projecting osteophyte from the distal clavicle causing mass effect on the myotendinous junction of the supraspinatus; and mild subacromial and subcoracoid bursitis. Tr. 351, 417.

Jirousek saw a physician assistant at Dr. Zanotti's office on July 23, 2012.[4] Tr. 345. The assessment was right shoulder impingement, right shoulder bicipital tendinitis, and improved left shoulder bicipital tendinitis. Tr. 345. Jirousek received an injection of Celestone and Lidocaine into the right subacromial space and was referred her to physical therapy for her neck and shoulder. Tr. 345. On August 1, 2012, Jirousek received an initial physical therapy evaluation at Total Joint Rehab. Tr. 339-340.

---

[4] The treatment notes indicate "All questions were answered by myself [the physician assistant] and Dr. D. Zanotti." Tr. 341.

In September 2012, Jirousek saw a physician assistant at Dr. Zanotti's office for two different visits. Tr. 342, 344. Jirousek continued to report pain in both shoulders as well as in her neck with stiffness in her neck. Tr. 342, 344. Jirousek reported some relief from an earlier injection in her left bicipital groove and past cortisone injections. Tr. 342, 344. Dr. Zanotti ordered a cervical MRI, which was taken on September 19, 2012, and showed degenerative and arthritic changes in the cervical spine; multilevel discogenic degenerative disease and a few bulging disks in the cervical spine but no evidence of a frank herniated nucleus pulposus; a few narrowed neural foramina but no spinal canal stenosis in the cervical spine; and unremarkable cervical cord with no cord compression at the c-spine. Tr. 348-349, 418-419.

A September 26, 2012, examination at Dr. Zanotti's office showed that Jirousek had "full overhead motion with the ability to get her hand behind her back lacking two-levels bilaterally." Tr. 342. She exhibited pain on impingement maneuvers and significant bicipital groove pain on the right with less on the right. Tr. 342. She had a positive Spurling's maneuver. Tr. 342. She reported no numbness or tingling in her hands. Tr. 342. Jirousek received an injection in her left shoulder, both subacromially and bicipitally, and a cortisone injection in the right bicipital groove. Tr. 342. Jirousek was provided a prescription for Mobic, since it had provided some relief in the past. Tr. 342. It was recommended that Jirousek be seen on an as needed basis if she had further concerns or questions regarding her shoulder or neck. Tr. 342.

On October 24, 2012, Jirousek was seen again at Dr. Zanotti's office. Tr. 329-330. Jirousek reported increasing pain in her left shoulder along the outside of her arm. Tr. 329. The physical examination showed full overhead motion with ability to get her hand behind her head and behind her back. Tr. 329. There was pain with internal rotation and pain on stressing in abduction as well as cross body stressing. Tr. 329. Jirousek exhibited 5/5 abduction and

supraspinatus strength. Tr. 329. Upon Jirousek's request, an injection of Celestone and Lidocaine was administered into the left subacromial space. Tr. 330. Jirousek would follow up with Dr. Zanotti on an as needed basis. Tr. 330. She planned to schedule an appointment with Dr. Kumar regarding her neck pain. Tr. 330.

*Medical evidence post-dating amended alleged onset date*

Jirousek saw Dr. Kumar on November 13, 2012. Tr. 361. She reported that the left side of her neck had flared up quite a bit from last seeing Dr. Kumar six months prior. Tr. 361. Jirousek indicated she sometimes had pain down the arm and numbness in her hands and arms when using them. Tr. 361. She was also having right-sided low back pain. Tr. 361. On examination, Dr. Kumar's observations included tenderness in the left mid-lower cervical paraspinal muscles with positive facet joint provocative maneuvers; strength was functional in the upper extremities; some pain with shoulder strength testing on the left; tenderness in the right lower lumbar paraspinal muscles with positive facet joint provocative maneuvers; some tenderness in the lumbrosacral junction; strength was functional for ambulation; and gait, coordination and balance were normal. Tr. 361. Dr. Kumar diagnosed left-sided back pain with cervical spondylosis, degenerative disk disease; numbness and tingling in the hands and arms; right-sided low back pain with facet arthropathy; chronic pain; and left shoulder pain with rotator cuff syndrome. Tr. 361. Dr. Kumar ordered physical therapy for the low back; x-rays of the lumbar and cervical spine; and facet joint injections in the cervical and lumbar regions. Tr. 361. Dr. Kumar also ordered EMG testing of the upper extremities. Tr. 361.

Om November 28, 2012, Jirousek underwent EMG testing of the upper extremities to evaluate for carpal tunnel syndrome. Tr. 449. The testing showed "electrodiagnostic evidence of mild bilateral median mononeuropathies at the wrist or carpal tunnel syndrome characterized

primarily by sensory fiber demyelination, left worse than right." Tr. 449. Jirousek was wearing wrist splints. Tr. 449.

On December 6, 2012, Jirousek received facet joint lumbar injections. Tr. 451-453. On December 12, 2012, Jirousek reported to Dr. Kumar's office that the injections had taken the edge off and she was doing about 70-80% better at the time. Tr. 364. There is a handwritten note on the December 12, 2012, office note that states, "When pain comes back we will do RF [radiofrequency]." Tr. 364.

In February 2013, Jirousek saw Dr. Potoczak with complaints of back pain. Tr. 430-434. Jirousek reported a gradual worsening of her back pain, which she described as burning with a severity level of 7/10. Tr. 431. On examination, Dr. Potoczak observed decreased range of motion, tenderness and spasm in the cervical back. Tr. 433. There was normal range of motion in the neck but pain and spasm in the neck and trapezius muscle. Tr. 433. Dr. Potoczak prescribed some medication but no other orders were placed. Tr. 434.

*Medical evidence post-dating date last insured*

On April 24, 2013, Jirousek called Dr. Kumar's office to report that she was having pain again and her injections for right side lumbar had worn off. Tr. 454. Per Dr. Kumar's prior instructions, she was calling about right side lumbar radiofrequency. Tr. 454. On May 2, 2013, radiofrequency ablation was performed at the right L3, L4, and L5 area. Tr. 455-457. Also, on May 2, 2013, knee x-rays were taken, which were normal. Tr. 443-444. Also, in May 2013, Dr. Kumar administered a right shoulder subacromial injection due to right shoulder pain. Tr. 458. Dr. Kumar held off on administering an injection in the left knee. Tr. 458.

Jirousek returned to see Dr. Potoczak on June 25, 2013, with reports of new pains –

– bilateral shoulder pain, bilateral knee pain, and bilateral hip pain for about two months.  Tr. 434-438.  She was receiving moderate relief through the use of Flexeril, Mobic, Vicodin, Tylenol and Motrin.  Tr. 434.  On examination, Dr. Potoczak observed normal range of motion in the neck but decreased range of motion and tenderness in the right shoulder; decreased range of motion, pain and spasm in the lumbar back; and tenderness in the left forearm.  Tr. 437.  Dr. Potoczak recommended that Jirousek try physical therapy and Lyrica.  Tr. 437.  Also, Dr. Potoczak indicated that Jirousek needed to have an MRI performed and a rheumatologist consult.  Tr. 437.

Upon Dr. Potoczak's referral, on July 2, 2013, Jirousek saw Vagesh M. Hampole, M.D., for possible fibromyalgia.  Tr. 572-574.  Dr. Hampole's examination findings included no swelling of any of the joints of upper and lower extremities; tender areas present over back, across shoulders and upper and lower extremities; no weakness; pain with range of motion in neck rotation, bilateral shoulder abduction, bilateral elbow flexion and extension, bilateral hip internal rotation and external rotation; motor and sensory function, reflexes, gait and coordination all intact.  Tr. 573.  Dr. Hampole assessed fibromyalgia and prescribed Flexeril and directed Jirousek to continue taking Lyrica as she had been.  Tr. 574.  Dr. Hampole ordered lab work, including an arthritis panel.  Tr. 574.  Jirousek's lab work showed a positive anti-nuclear antibodies (ANA) test at 1:80 titers.[5]  Tr. 577.  Dr. Hampole reviewed the lab work with Jirousek on July 23, 2013, and continued the diagnosis of fibromyalgia but added cervical radiculitis.  Tr. 579.  Dr. Hampole started Jirousek on Trazadone and stopped the Flexeril.  Tr. 579.  Lyrica, Mobic, and Vicodin were continued.  Tr. 579.  Jirousek was going to follow up with Dr. Kumar

---

[5] ANAs "are seen in a variety of systemic rheumatic diseases[.]" Tr. 577.  "[T]iters greater than or equal to 1:160 are considered clinically significant . . . however, healthy individuals and those with advanced age have been reported to be positive for ANA." Tr. 577.

regarding the cervical radiculitis.  Tr. 579.  Jirousek continued to see Dr. Hampole from September 2013 through April 2014.  Tr. 582-587.  Dr. Hampole's examination results were generally the same throughout with some changes to medications made during Dr. Hampole's treatment of Jirousek.  Tr. 585.

On July 24, 2013, Jirousek saw Dr. Kumar with complaints of shoulder and neck pain. Tr. 461.  She was having numbness down her right arm.  Tr. 461.  Jirousek indicated that the numbness was driving her crazy at times and affecting her quality of life.  Tr. 461.  She was frustrated with the pain.  Tr. 461.  On examination, Spurling's maneuver was mildly positive and there was positive impingement signs in the right shoulder.  Tr. 461.  Strength was 5/5 in the upper extremities.  Tr. 461.  Extension and rotation were limited in the neck and forward flexion past 100 degrees caused some shoulder pain.  Tr. 461.  Gait, coordination and balance were normal.  Tr. 461.  Dr. Kumar assessed right sided cervical spondylosis with radiculitis, most likely at C6; rotator cuff dysfunction right shoulder; chronic pain; and history of lumbar pathology.  Tr. 461.  Dr. Kumar recommended an MRI of the right shoulder and a cervical epidural.  Tr. 461.  An August 3, 2013, MRI of the right shoulder showed no significant change since the July 2, 2012, MRI.  Tr.  439-440.  Jirousek received a cervical epidural injection at the C7-T1 level on July 25, 2013.  Tr. 463-465.  During an August 8, 2013, appointment for medial branch blocks at the C4, C5, and C6 levels for right-sided neck pain radiating down the shoulder, Jirousek reported no improvement from the cervical epidural injections she had received two week earlier.  Tr. 466-468.   She also reported that when she saw a surgeon there was no indication for surgical intervention.  Tr. 466.  On August 15, 2013, Jirousek reported about 30% relief of her right shoulder and arm pain from the C4, C5, and C6 medial branch blocks but she

was continuing to have pain from the neck down to her index finger along the C6 dermatome. Tr. 469. Thus, a C6 right nerve block was administered. Tr. 469-471.

On September 6, 2013, Jirousek saw Dr. Kumar reporting continued pain and only minimal relief from the C6 nerve block. Tr. 472. The medial branch blocks and epidural were not helpful. Tr. 472. Jirousek relayed to Dr. Kumar that she was seeing Dr. Hampole who was prescribing Lyrica for possible fibromyalgia. Tr. 472. Dr. Kumar recommended an EMG of the upper extremities, noting that a cervical spine MRI might be required depending on the results of the EMG. Tr. 472. He also recommended a "small work LSO brace to help reduce pain in the lumbar spine and restrict[] mobility of the trunk and to help support the spinal muscles." Tr. 472.

EMG testing was performed on September 13, 2013. Tr. 474. The results of the testing showed "electrodiagnostic evidence of mild to moderate bilateral median mononeuropathies at the wrist or carpal tunnel syndrome characterized primarily by demyelination with some chronic changes. There is also a hint of axonal irritation on the right at C6 but no active denervation." Tr. 474. Dr. Kumar recommended a right-sided carpal tunnel injection. Tr. 474. If that did not work, Dr. Kumar indicated that an MRI of the cervical spine may be needed. Tr. 474. On September 18, 2013, Jirousek received a right carpal tunnel injection. Tr. 476-477.

During an October 18, 2013, follow-up visit with Dr. Kumar, Jirousek reported that the carpal tunnel injection did not help much. Tr. 478. She was still having pain in the neck going down the right arm. Tr. 478. Also, Jirousek indicated she was favoring her right leg but her low back was hurting more on the right side. Tr. 478. Physical examination findings, included a positive Spurling maneuver on the right; numbness in the C6 distribution on the Right; tenderness in the right lower lumbar paraspinal muscles with positive facet joint

provocative maneuvers; gait was antalgic favoring the right lower extremity; balance was fair; coordination was normal; and there was a decreased range of motion with right sided rotation and side bending of the cervical spine. Tr. 478. Dr. Kumar recommended radiofrequency ablation on the right at L3-4-5 and a cervical spine MRI. Tr. 478.

Radiofrequency ablation was performed on November 4, 2013, on the right at L3, L4, and L5. Tr. 480-482. A November 8, 2013, cervical spine MRI showed "Mild cervical spondylosis, with canal narrowing with mild canal narrowing at C5-6 and C6-7. Right foraminal narrowing at C3-4. No significant change from MRI scans dated September 19, 2012." Tr. 441.

In early January 2014, Jirousek called seeking an appointment with Dr. Kumar, indicating she was having severe pain in her right shoulder and she was interested in an injection. Tr. 485. She saw Dr. Kumar on January 14, 2014. Tr. 486. Dr. Kumar noted that Jirousek was at the visit for right sided neck pain and posterior shoulder pain and she wanted a shoulder injection. Tr. 486. However, on examination, Jirousek did not have any pain with the shoulder with internal or external rotation or abduction and flexion so no shoulder injection was administered. Tr. 486. She did have significant spasms in the right parascapular region and trapezius region; her neck range of motion was impaired significantly and there was tenderness in the right mid lower cervical paraspinal muscles. Tr. 486. Turning and twisting bothered her. Tr. 486. She was taking two Norco at a time at 5 mg strength, which helped a little, and she was taking Flexeril and Motrin. Tr. 486. Dr. Kumar increased the Norco strength to 10 mg, twice a day, as needed, and recommended C4-5, C5-6, and C6-7 cervical facet joint injections to calm down her pain. Tr. 486. The facet joint injections were performed on January 15, 2014. Tr. 488-490.

Jirousek saw Caryn DeLisio, CNP, with Dr. Kumar's office on May 21, 2014, for follow up. Tr. 491. Nurse DeLisio noted that Jirousek had done very well with radiofrequency ablation in the past, as well as with cervical facet joint injections. Tr. 491. Accordingly, radiofrequency ablation on the right at levels L3-4 and 5 was set up and, after that, cervical facet joint injections would be performed on the right at C4-5, C5-6 and C6-7. Tr. 491, 493-495, 496-498. Also, a TENS unit was ordered. Tr. 491. Jirousek reported point tenderness on the right elbow so an x-ray of the right elbow was ordered to rule out other issues. Tr. 491.

Upon Dr. Kumar's referral, on June 25, 2014, Jirousek saw Robert Perhala, M.D., for a consultation for possible lupus. Tr. 515-519. Jirousek reported neck stiffness and pain for about 6-7 years and low back and hip pain for about 4-5 years. Tr. 515. She reported 2-3 hours of morning stiffness, mostly in the spinal area. Tr. 515. Jirousek reported that she walked regularly for exercise. Tr. 516. On examination, Dr. Perhala observed that Jirousek walked with a slightly antalgic gait; there was moderate tenderness of the cervical paraspinal area bilaterally, right lumbar paraspinal area down into the right SI joint area; tenderness in the shoulders bilaterally; synovial thickening and tenderness of the right elbow; tenderness in right finger joints; tenderness in the knees; and full range of motion in shoulders, elbows, wrists, hips, knees, ankles. Tr. 517. Dr. Perhala found no tenderpoints of fibromyalgia present but noted 8 tender joints and 1 swollen joint. Tr. 517. Jirousek's upper and lower extremity strength was 5/5 bilaterally and her reflexes in her upper and lower extremities were normal bilaterally. Tr. 518. Dr. Perhala reviewed radiology reports, noting that Jirousek's left knee x-ray was normal; an x-ray of her knees bilaterally was normal; a cervical spine MRI showed "DDD with mild stenosis," and a right shoulder MRI showed "AC arthrosis and RC tendonosis." Tr. 518. Dr. Perhala assessed unspecified polyarthropathy inflammatory; unspecified backache; cervicalgia; and

"shoulder region affections other not elsewhere class." Tr. 518. Dr. Perhala indicated that he felt strongly that Jirousek's arthritis was "inflammatory in basis, that she should be on DMARD therapy" and he was "going to initiate sulfasalazine . . . a high risk medication requiring lab monitoring consistently." Tr. 519. Lab work showed an ANA titer of 1:160. Tr. 522.

In July 2014, Jirousek saw Dr. Kumar. Tr. 499. She had some relief from the radiofrequency ablation and facet joint injections. Tr. 499. She was continuing to use Norco 10 mg at night. Tr. 499. Jirousek was seeing Dr. Perhala for more rheumatologic workup. Tr. 499. She was having pain in her knees, back and neck with spasms. Tr. 499. Activity bothered Jirousek. Tr. 499. She had no new numbness or weakness. Tr. 499. Dr. Kumar continued Jirousek on Norco 10 mg and directed Jirousek to call if she needed a right SI joint injection. Tr. 499. On August 11, 2014, Jirousek called Dr. Kumar requesting the SI injection and, on August 18, 2014, Dr. Kumar administered the injection. Tr. 502-504.

Jirousek saw Dr. Perhala on August 18, 2014, for follow up of her inflammatory arthritis. Tr. 523-526. Jirousek reported being more fatigued but her inflammatory arthritis was under "fair control." Tr. 523. She reported a "degree of stiffness and pain in the hands, wrists, shoulders, knees and feet more on the right side. Most other joints [were] stable." Tr. 523. Norco, prescribed through her other doctors, was providing her relief for breakthrough pain. Tr. 523. On examination, Dr. Perhala observed 13 tender joints and 1 swollen joint but no tenderpoints of fibromyalgia and full range of motion. Tr. 525. Because of the possibility that Jirousek's medication was causing her fatigue, Dr. Perhala changed Jirousek from Sulfasalazine to Plaquenil. Tr. 526, 529.

Jirousek saw Dr. Perhala on October 20, 2014, for follow up. Tr. 529-532. Jirousek's inflammatory arthritis had been under "fair control" since the last visit. Tr. 529. Plaquenil

therapy was providing minimal control of Jirousek's arthritis. Tr. 529. As he had in the prior visit, Dr. Perhala observed 13 tender joints and 1 swollen joint. Tr. 531. There was full range of motion. Tr. 530-531. Dr. Perhala stopped Plaquenil since the effects were minimal and started Jirousek on Methotrexate. Tr. 532.

On October 23, 2014, Jirousek saw Dr. Kumar for follow up. Tr. 506. She indicated that she had been diagnosed with rheumatoid arthritis and was taking Methotroxate. Tr. 506. She reported being in miserable pain and understood she could not have another radiofrequency procedure until December. Tr. 506. Norco helped some but she sometimes needed to take two in a day. Tr. 506. Dr. Kumar's physical examination revealed that Jirousek ambulated in a flexed spine position favoring the left leg; she was very tender in the right mid-low back with positive facet joint provocative maneuvers; straight leg raising was negative for radicular pain; there was quite a bit of muscle hypertonicity appreciated; balance was fair; coordination was normal; neck pain was worse on extremes; there was mild tightness in hamstrings; there was generalized stiffness. Tr. 506. Dr. Kumar's diagnoses were right sided mid-low back pain with facet arthropathy; SI joint dysfunction; cervical spondylosis; degenerative disk disease; rheumatoid arthritis; and chronic pain. Tr. 506. Until the radiofrequency ablation procedure could be performed, Dr. Kumar recommended right L3-4, L4-5, L5-S1 facet joint injections. Tr. 506. Also, Dr. Kumar planned to get lumbar flexion/extension x-rays. Tr. 506. Dr. Kumar also increased Jirousek's Norco. Tr. 506. X-rays of the lumbar spine were taken on October 23, 2014, which showed "[m]ild mid and distal lumbar posterior element arthritis, no change with flexion and extension." Tr. 445. Facet joint injections were performed on October 27, 2014. Tr. 508-509.

On November 21, 2014, Jirousek saw Dr. Kumar and reported that the facet joint injections had helped her a lot and were continuing to help her but they were wearing off. Tr. 510. She indicated that the Methotrexate and Motrin helped. Tr. 510. She did not need to take as much Norco because of the facet joint injections. Tr. 510. Activity bothered her and her pain was affecting her quality of life. Tr. 510. Dr. Kumar recommended radiofrequency ablation after December 2, 2014. Tr. 510. There was some tenderness in the right mid low back with positive facet joint provocative maneuvers but her straight leg raising was negative and she could heal walk and toe walk. Tr. 510. A prescription for Celebrex was added to her medications. Tr. 510. The radiofrequency ablation procedure was performed on December 9, 2014. Tr. 512-514.

On December 16, 2014, Jirousek saw Dr. Perhala. Tr. 538-541. With Methotrexate, Jirousek's arthritis was under fair control and Jirousek was tolerating the medication without significant side effects. Tr. 538. Dr. Perhala continued Jirousek on Methotrexate. Tr. 541.

### 2. Opinion evidence

#### a. Treating physicians

*Douglas Potoczak, M.D.*

On March 5, 2015, Dr. Potoczak completed a "Medical Source Statement: Physical Abilities and Limitations" ("MSS") wherein he provided his opinion regarding Jirousek's abilities as of November 2012. Tr. 591-592. Dr. Potoczak opined that Jirousek would have difficulty standing/walking, sitting, lifting/carrying, fingering, handling, and reaching due to rheumatoid arthritis and chronic neck, back and/or shoulder pain. Tr. 591-592. Dr. Potoczak opined that Jirousek could stand/walk at one time for 30 minutes with a break in between and she could stand/walk a total of 4 hours in an 8-hour period with intermittent breaks. Tr. 591. Dr. Potoczak opined that Jirousek could sit for 20-30 minutes at one time, noting that she develops

pain after 20 minutes of sitting.  Tr. 591.  He also opined that she could sit for a total of 4 hours in an 8-hour period with intermittent breaks.  Tr. 591.  Dr. Potoczak opined that Jirousek could lift/carry 5 pounds occasionally and 1-2 pounds frequently.  Tr. 591.   Dr. Potoczak opined that Jirousek was limited to occasional fingering and handling bilaterally.  Tr. 591-592.  Dr. Potoczak also opined that Jirousek was limited to occasional reaching.   Tr. 592.  Dr. Potoczak was asked whether there was anything that would prevent Jirousek from being able to complete 8-hour workdays on a consistent (i.e., 5 days per week, every week) basis within the stated limitations.  Tr. 592.  In response, Dr. Potoczak stated: "[M]edication side effects, patient is incapacitated during RA treatments and during episodic flare ups [of] neck [and] back [and] shoulder pain – inability to work full days."  Tr. 592.  Also, at the bottom of the form, above his statement regarding the date he first examined Jirousek, Dr. Potoczak added the following note – "Disability 2012[.]"  Tr. 592.

A few weeks later, on March 25, 2015, Dr. Potoczak completed the same MSS form that was completed on March 5, 2015, with similar opinions regarding Jirousek's limitations.  Tr. 395-395.  On March 25, 2015, Dr. Potoczak also completed a Medical Statement Regarding Abilities and Limitations for Social Security Disability Claim.  Tr. 596-598.  These opinions pre-date the ALJ's April 6, 2015, decision but they were only submitted to the Appeals Council after the issuance of the ALJ's decision.  Tr. 593 (July 14, 2015, cover letter to Appeals Council enclosing copies of Dr. Potoczak's March 25, 2015, statements).

*Robert Perhala, M.D.*

On January 30, 2015, Dr. Perhala completed a Medical Source Statement, in which he offered his opinions regarding Jirousek's conditions and limitations.  Tr. 588-589.  Dr. Perhala identified Jirousek's diagnosis as inflammatory/seronegative arthritis.  Tr. 588.  Dr. Perhala

indicated that Jirousek had a history of joint pain, swelling and tenderness; morning stiffness; and limitation of motion in her joints. Tr. 588. Dr. Perhala stated that the following joints had inflammation at the most recent examination – left-hand, right-hand, right wrist, left shoulder, right shoulder, neck, c-spine, and parascapular regions. Tr. 588. Dr. Perhala opined that Jirousek could stand at one time for 15 minutes; sit at one time for 30 minutes; work 2 hours per day; lift 5 pounds occasionally and no amount of weight frequently; never bend or stoop; frequently perform fine and gross manipulation with the left hand; occasionally perform fine and gross manipulation with the right hand; and never raise arms over shoulder level bilaterally. Tr. 588-589. Dr. Perhala explained:

> [Jirousek] has a seronegative inflammatory arthritis akin to rheumatoid arthritis and limitations for her peripheral joints are listed above. Note she has significant limitations due to neck/thoracic [and] pariscapular pain that Dr. Kumar manages.

Tr. 589.

Subsequently, Dr. Perhala was provided treatment records from Dr. Potoczak dated 2/8/13 and 6/25/13, pain management notes from Dr. Kumar dated 11/13/12, rheumatology notes from Dr. Hampole dated 7/2/13 through 4/17/13, and orthopedic notes from Dr. Zanotti and Blake Currins, PA-C, dated 6/27/12 through 10/24/12. Tr. 590. Dr. Perhala was asked questions and provided answers as detailed below:

> Can you give an opinion about her limitations with a reasonable degree of medical certainty at least as early as March 2013 based on your treatment after that date, the history of Ms. Jirousek has provided to you, your knowledge of the nature of her limiting conditions, and your review of her medical treatment provided to you as described above? Yes
>
> If yes, do the limitations indicated on the Medical Source Statement, signed by you on 1/30/15, apply at least as early as March 2013? Yes
>
> > 1. If yes, please explain how you reached that conclusion: The exams and statements made by Dr. Potoczak, Dr. Kumar, Dr. Hampole [and] Dr.

> Zanotti are consistent with my present findings regarding the neck/shoulder/shoulder blade pain I have been managing her with.

Tr. 590.

### b. Reviewing physicians

*Initial*

On March 11, 2013, state agency reviewing physician James Cacchillo, D.O., completed a Physical RFC Assessment. Tr. 75-76. Dr. Cacchillo opined that Jirousek could lift/carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull unlimitedly, other than as shown for lift/carry. Tr. 75. Dr. Cacchillo explained that the foregoing exertional limitations were "[d]ue to chronic neck (cervical DDD) and B/L shoulder pain (rotator cuff tendonitis and bursitis. [Jirousek] also with low back pain (facet arthropathy)." Tr. 75. Dr. Cacchillo also opined that Jirousek had the following postural limitations – never climb ladders/ropes/scaffolds; occasionally climb ramps/stairs, stoop, kneel, and crawl; and frequently crouch. Tr. 75-76. Dr. Cacchillo explained that the limitation of no climbing ropes or ladders was because of a limited ROM in shoulders. Tr. 76. Dr. Cacchillo opined that Jirousek would be limited to overhead reaching bilaterally due to limited range of motion in both shoulders. Tr. 76.

*Reconsideration*

Upon reconsideration, on July 23, 2013, state agency reviewing physician Diane Manos, M.D., completed a Physical RFC Assessment. Tr. 87-89. Her opinions regarding Jirousek's RFC were the same as Dr. Cacchillo's. Tr. 87-89.

### c. Consultative psychological evaluation

On April 11, 2013, a consultative psychological evaluation was performed by Thomas M. Evans, Ph.D. Tr. 399-403. When asked about the nature of her disability and the reason for her

disability application, Jirousek indicated that it was "[f]or my neck and back." Tr. 399. Dr. Evans diagnosed depressive disorder, not otherwise specified. Tr. 402, 403. Dr. Evans found that there was "no indication that Ms. Jirousek attempted to exaggerate[] or fabricate her symptoms." Tr. 403. Dr. Evans opined that her depression appeared to be secondary to her physical problems. Tr. 402. During his evaluation, Dr. Evans observed that Jirousek "walked unassisted, [but] she presented with a significant limp and [her] pace was slow. However, she was not observed to be in any physical distress and sat comfortably in her seat throughout the entire evaluation." Tr. 402. When asked about her activities of daily living, Jirousek reported that she had a driver's license and was able to drive; she and her husband shared in the cooking, cleaning and laundry; and she went grocery shopping with her husband. Tr. 400. She described a typical day as "Drive kids to school; do a little housework; make some dinner; homework with kids; bed." Tr. 401.

## C.     Testimonial evidence

### 1.       Plaintiff's testimony

Jirousek was represented and testified at the hearing. Tr. 41-55. She indicated that she has problems going up and down stairs because of pain and swelling in feet, ankles, and knees. Tr. 45. She has to travel the stairs very slowly and limit the number of times that she goes up and down. Tr. 45. Using ice, heat and medicine help lessen some of her pain. Tr. 45.

In the summer of 2014, Jirousek was diagnosed with rheumatoid arthritis. Tr. 54. Following that diagnosis, she was prescribed Methotrexate. Tr. 55. Jirousek believes that the Methotrexate helps her. Tr. 55. Jirousek indicated that her rheumatoid arthritis affects her all over. Tr. 54. In addition to her knee, ankle and foot pain, she has problems with her wrists, fingers, shoulders, jaw, and hips. Tr. 54.

During the day, Jirousek does a limited amount of cleaning. Tr. 46. She washes dishes but has to sit down and take a break at times. Tr. 46. Jirousek's laundry room is in the basement so, about once a week, she will go down to the basement and do a few loads of laundry so she does not have to go up and down the stairs. Tr. 45, 48. She is not able to carry the clothes back up – either her husband or children will carry the finished laundry upstairs for her. Tr. 53. If she is feeling up to it, some nights Jirousek will cook dinner. Tr. 46. If she prepares a meal, it is usually something that does not require a lot of standing, such as a crock pot meal. Tr. 46. Jirousek generally does not do the grocery shopping. Tr. 47. If Jirousek goes grocery shopping, she goes with her husband. Tr. 47-48. He carries the heavy items. Tr. 48. Jirousek attends monthly 4-H meetings with her daughter. Tr. 49. Otherwise, she does not usually socialize or attend events. Tr. 49-51.

Also, during the day, Jirousek reads, watches television and takes naps. Tr. 48. Jirousek owns a computer and uses it to check e-mails. Tr. 48. She naps every day for at least an hour and a half because she does not sleep well at night – she tosses and turns. Tr. 48. About two or three days a week, she just rests and sleeps all day. Tr. 51. The Methotrexate makes Jirousek very tired for the first few days after taking. Tr. 52. She takes six Methotrexate pills on a Monday and is fatigued and feels poorly until about Thursday and then she starts to feel better but, by Sunday, she starts to get stiff and sore again. Tr. 52-53. Jirousek also takes Lyrica and Norco (Vicodin). Tr. 53. She takes three Lyrica each day; it makes her fuzzy-headed. Tr. 53. She has to take Norco about 4 times each week. Tr. 53. She does not take it unless her husband is home because it makes her "kind of feel weird" and nauseous. Tr. 53.

Jirousek estimated being able to stand for 15-20 minutes at one time. Tr. 46. After that amount of time, Jirousek starts to have pain through her lower back and right leg. Tr. 46-47.

She has to sit down and take a break.  Tr. 47.  Sometimes, she will apply ice to her back.  Tr. 47.

Jirousek estimated being able to sit for 10-15 minutes before she needs to take a break.  Tr. 47.

Jirousek can drive but she does not drive far.  Tr. 47.  For example, she drives her children to

school but it is only a block away.  Tr. 47.  She explained that she does not trust herself to drive

far because it is difficult for her to turn her head back and forth due to the pain and stiffness in

her neck.  Tr. 47.

### 2.    Vocational Expert

Vocational Expert ("VE") Gail A. Klier testified at the hearing.  Tr.  55-61, 63-67.   The

VE described Jirousek's past relevant work as a bartender/waitress, breaking the position into

two job titles – bartender and waitress – because the DOT does not have one code for both

positions performed together.  Tr. 56, 57.  The VE indicated that the DOT described both the

bartender and waitress position as light, semi-skilled positions.  Tr. 56.  The VE indicated that

Jirousek performed both positions at the medium level.  Tr. 56.

The ALJ asked the VE whether a hypothetical individual of Jirousek's age, education,

and past relevant work experience, with the capacity to perform light work and who can climb

ramps and stairs occasionally; never climb ladders, ropes or scaffolds; stoop occasionally; never

kneel; and reach overhead bilaterally occasionally could perform Jirousek's past relevant work.

Tr. 56-57.   The VE indicated that the described individual would be unable to perform

Jirousek's past work as Jirousek performed it, i.e., at the medium level, but would be able to

perform the past work as described in the DOT, i.e., at the light level.  Tr. 57.   Upon additional

questioning by the ALJ, the VE indicated that there would be other jobs, in addition to Jirousek's

past relevant work, that the hypothetical individual counsel perform, including ticket taker, usher, and fitting room attendant, all light, unskilled positions.[6]  Tr. 63-65.

The VE testified further that the hypothetical individual would be precluded from full-time competitive work if the hypothetical individual was limited to something less than eight hours of work activity per day.  Tr. 57-58.

The ALJ also asked the VE to consider another hypothetical individual who could perform eight hours of sitting and standing but would have to alternate between standing and sitting – not standing more than 15 minutes at a time and not sitting more than 30 minutes at a time – and the individual would be limited to lifting five pounds, on an occasional basis, and none, frequently.  Tr. 58.  The VE indicated that the described individual would not be able to perform Jirousek's past relevant work as described in the DOT or as performed.  Tr. 58.  Also, the VE indicated that the lifting limitations were significant and would be work preclusive.  Tr. 58.  Also, the VE indicated that the employer would have to allow for the alternating between sitting and standing at the sedentary demand level.  Tr. 58-59.

The ALJ then modified the first hypothetical, adding that the individual would also be unable to reach overhead, bilaterally, and asked whether that additional limitation would affect the individual's ability to perform work as a waitress or bartender.  Tr. 59.  The VE indicated that the DOT does not specify overhead versus normal reaching but, based on how the jobs are performed in the real world, reaching would be required and at least, occasionally overhead.  Tr. 59.

---

[6] The VE provided regional, state and national job incidence data for the identified jobs.  Tr. 63-65.

### 3. Third party statements

Third party statements, dated February 2015, were provided by two of Jirousek's friends, Ms. Newman and Ms. Smith, and her mother-in-law, all of whom indicated they had known Jirousek for many years. Tr. 214-216. They stated that Jirousek used to be athletic and energetic and a hard worker. Tr. 214-216. They all indicated that Jirousek is no longer the person she used to be. Tr. 214-216. They have observed drastic changes in Jirousek's ability to do things, noting that Jirousek is in pain and exhausted and receives assistance from others with chores and caring for her children. Tr. 214-216.

## III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[7] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[7] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[8] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her April 6, 2015, decision, the ALJ made the following findings:[9]

---

[8] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[9] The ALJ's findings are summarized.

1. Jirousek last met the insured status requirements on March 31, 2013. Tr. 20.

2. Jirousek did not engage in substantial gainful activity during the period from her amended alleged onset date of November 1, 2012, through her date last insured of March 31, 2013. Tr. 20.

3. Through the date last insured, Jirousek had the following severe impairments: degenerative disk and degenerative joint disease of the cervical and lumbar spine, obesity, bilateral shoulder pain and rheumatoid arthritis. Tr. 20-22. Fibromyalgia, bilateral carpal tunnel syndrome, and affective disorders were non-severe impairments. Tr. 20-22.

4. Through the date last insured, Jirousek did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 22.

5. Through the date last insured, Jirousek had the RFC to perform light work except she could climb ramps and stairs occasionally, never climb ladders/ropes/scaffolds, occasionally stoop, never kneel, occasionally crouch and never crawl, and occasionally reach overhead bilaterally. Tr. 22-28.

6. Through the date last insured, Jirousek was capable of performing past relevant work as a bartender and waiter because the work did not require the performance of work-related activities precluded by Jirousek's RFC. Tr. 28-29.

7. Alternatively, considering Jirousek's age, education,[10] work experience and RFC, there were other jobs that existed in significant numbers in the national economy that Jirousek could perform – ticket taker, usher, and fitting room attendant. Tr. 29-30.

Based on the foregoing, the ALJ determined that Jirousek was not under a disability from the alleged onset date through March 31, 2013, the date last insured. Tr. 18, 30.

## V. Parties' Arguments

Jirousek argues that the ALJ violated the treating physician rule with respect to two of her treating physicians – Dr. Potoczak and Dr. Perhala – when weighing the medical opinion

---

[10] Jirousek was 44 years old, defined as a younger individual age 18-49, on the date last insured; had at least a high school education and is able to communicate in English. Tr. 29.

evidence. Doc. 16, pp. 14-23, Doc 25, pp. 1-6. Jirousek also argues that the ALJ did not properly assess her credibility. Doc. 16, pp. 23-25; Doc. 25, pp. 6-7.

In response, the Commissioner argues that the ALJ properly weighed the medical opinion evidence and properly assessed Jirousek's credibility. Doc. 22, pp. 10-21.

## VI. Law & Analysis

### A. Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### B. Establishing disability in a DIB claim

Jirousek's claim is a DIB claim. Unlike Supplemental Security Income ("SSI") benefits, to receive DIB benefits, a claimant must show that her disability started on or before her date last insured. 20 C.F.R. §§ 404.101(a); 404.131(a); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) ("In order to establish entitlement to disability insurance benefits, an individual must establish that [s]he became 'disabled' prior to the expiration of his insured status."); *Dettloff v. Sec'y of Health & Human Servs.*, 16 F.3d 1219, * 1 (6th Cir. 1993) (unpublished) (in order to show an entitlement to benefits, burden was on claimant to prove disability prior to date last insured).

Jirousek's date last insured was March 31, 2013. Tr. 20. Thus, in order to demonstrate entitlement to DIB benefits, Jirousek must show that that her disability started on or before March 31, 2013.

**C.  The ALJ properly considered and weighed the opinions of Dr. Potoczak and Dr. Perhala and the opinions of the state agency reviewers**

Jirousek argues that the ALJ erred in weighing the opinions rendered by her treating physicians Dr. Potoczak and Dr. Perhala and improperly assigned more weight to the opinions of the state agency reviewers than to her treating sources.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent

reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c). When controlling weight is not provided to treating source opinions, the factors set forth in 20 C.F.R. § 404.1527(c)(2)(i), (c)(2)(ii) and (c)(3) through (c)(6) are also considered when deciding the weight to assign to other medical opinions in the record. *See* 20 C.F.R. § 404.1527. However, an ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

In making a determination regarding Jirousek's disability claim, the ALJ considered evidence pre-dating November 1, 2012, Jirousek's amended alleged onset date, and post-dating March 31, 2013, her date last insured, including her subjective allegations, treatment records from her various treating doctors, objective medical testing, types of treatment and relief obtained, and third-party lay witness statements. Tr. 22-28. Additionally, the ALJ considered and explained the weight assigned to the medical opinion evidence, including the opinions of Drs. Potoczak and Perhala. Tr. 28. As discussed more fully below, the ALJ properly considered and weighed the medical opinion evidence.

### 1.  Dr. Potoczak

In considering Dr. Potoczak's March 5, 2015, opinion, the ALJ stated:

The undersigned gave limited weight to the medical source statement from Douglas Potoczak, M.D., dated March 5, 2015, to the extent that the claimant was also limited to a reduced range of sedentary exertion work (i.e., lift/carry 1-5 pounds, stand/walk 30 minutes, sit 20-30 minutes, and occasionally finger/handle/reach[)]. Dr. Potoczak based his conclusions on rheumatoid arthritis and chronic shoulder, neck and back pain dating back to at least 2006. He opined that the claimant was unable to work a full-time sustained schedule. However, Dr. Potoczak did not provide medical findings that would support this level of restriction as evidenced by exhibit 7F. His conclusions were also inconsistent with the preponderance of medical evidence. Further, statements of disability remain reserved for the commissioner. Therefore, the undersigned gave limited weight to this opinion (Ex. 16F).

Tr. 28.

Jirousek contends that the ALJ erred because she did not identify Dr. Potoczak as a treating source when weighing his opinion. However, the ALJ acknowledged that there was an ongoing treatment relationship between Dr. Potoczak and Jirousek when discussing in detail Dr. Potoczak's treatment records. Tr. 24 ("The records showed a treating history with Douglas Potoczak, M.D. In February 2013 . . ."). Since the ALJ acknowledged that a treating relationship existed between Dr. Potoczak and Jirousek even before the date last insured, Jirousek has failed to demonstrate reversible error based on the failure of the ALJ to specifically note that Dr. Potoczak was a treating source when explaining the weight assigned to his opinion.

Jirousek also contends that, since Dr. Potoczak was a treating source, the ALJ's analysis and explanation for providing limited weight to the opinion was insufficient to satisfy the requirements of the treating physician rule. However, the ALJ's explanation is sufficiently clear to allow this Court the ability to assess whether the ALJ's reasons are good reasons supported by substantial evidence.

Here, the ALJ concluded that Dr. Potoczak's opinion limiting Jirousek to a reduced range of sedentary work was not supported by medical findings and was inconsistent with other evidence of record. Tr. 28. The ALJ discussed in detail medical treatment history, including

treatment and observations made by Dr. Potoczak. Tr. 22-26. Following that detailed

discussion, the ALJ summarized her findings regarding what the evidence revealed stating:

> . . . Although the claimant does have established degenerative/arthritic findings in the cervical and lumbar spine as well as the bilateral shoulders, records prior to her date last insured indicated that they were generally *mild/minor* changes. Imaging of the bilateral knees was *normal* during the relevant period. There was no abnormal imaging of the elbows or ankles. Her bilateral carpal tunnel syndrome was also *mild* during the relevant period. The records showed no "well established" diagnosis of fibromyalgia from a rheumatologist prior to her date last insured. Her rheumatologist indicated that the claimant had "fair control" of her inflammatory arthritis while treating with prescribed Methotrexate as late as December 2014. During the relevant period, she often had no obvious upper motor neuron signs or symptoms. Strength remained functional for ambulation. Gait, coordination, and balance were often normal. . .

> Overall, the claimant's treatment has been relatively conservative in nature prior to her date last insured. She has not undergone any recent surgeries. No physician indicated that she was a surgical candidate. Her treatment has generally consisted of heat, ice or pain medications, which have been relatively effective in controlling her symptoms. She reported that Cortisone injections and chiropractic manipulation "helped" her radicular neck and back pain. She reported that cervical spine epidural injections helped to reduce her neck pain by "80%" (Ex. 5F). Her chiropractor noted that her condition "was improving" with chiropractic manipulation and moist heat (Ex. 2F). The claimant testified that Methotrexate "helped" to lessen her pain overall. She noted that Mobic and Tylenol "helped" her do her daily activities (Ex. 5F). She reported that RF ablation "helped" her right lower back pain and facet joint injections calmed her right upper buttock pain down by "50%" (Ex. 10F). She reported that Motrin "helps" her generalized pain (Ex. 10F).

Tr. 26-27 (emphasis in original).

Notwithstanding the ALJ's detailed discussion of the evidence, Jirousek contends that the

evidence shows that Dr. Potoczak's opinion is supported by his medical findings, pointing to

treatment notes documenting pain and tenderness, stiffness, decreased range of motion and

muscle spasms and a summary in Dr. Potoczak's treatment notes shortly before the date last

insured. Doc. 16, p. 17. However, it is not for this Court to "try the case *de novo*, nor resolve

conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Moreover,

Jirousek has not shown that the ALJ's findings are unsupported by substantial evidence and, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

Furthermore, there are certain issues that are reserved to the Commissioner for determination. For example, opinions that a claimant is disabled or an opinion as to a claimant's RFC are issues ultimately reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Although treating source opinions on issues reserved to the Commissioner may not be ignored, such opinions are never entitled to controlling weight. *See* SSR 96–5p, 1996 WL 374183, * 2-3 (July 2, 1996); *see also Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 505 (6th Cir. 2013) (unpublished) ("If the treating physician . . . submits an opinion on an issue reserved to the Commissioner – such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors – [the ALJ's] . . . decision need only explain the consideration given to the treating source's opinion." ) (internal quotations and citations omitted). Here, Dr. Potoczak's statement that Jirousek had an "inability to work full days" and his note of "Disability 2012" (Tr. 592) amount to opinions that Jirousek was disabled. Accordingly, the ALJ did not err in discounting the opinion based on the fact that it contained opinions on issues reserved to the Commissioner.

The ALJ's explanation of her consideration of Dr. Potoczak's March 5, 2015,[11] opinion is sufficiently clear to allow for review by this Court. Further, considering medical evidence obtained during the period prior to the date last insured, which the ALJ detailed in her opinion,

---

[11] Dr. Potoczak also provided opinions dated March 25, 2015. Tr. 594-598. However, those opinions were submitted only to the Appeals Council and were not before the ALJ. Tr. 593.

Jirousek has not demonstrated that the ALJ's decision to provide "limited weight" to Dr.

Potoczak's opinion is not supported by substantial evidence.

### 2. Dr. Perhala

In considering Dr. Perhala's January 2015 opinions, the ALJ stated:

> The undersigned gave limited weight to the medical source statement completed by Dr. Perhala in January 30, 2015, to the extent that the claimant was limited to reduced range of sedentary exertion work (i.e., lift 5 pounds occasionally, stand 15 minutes, sit 30 minutes, never bend or stoop, bilateral gross and fine manipulation limits, and no overhead aim raising). Dr. Perhala opined that the claimant was limited to working only two hours per day. He based his conclusions on the claimant's persistent neck, shoulder, and hand pain dating back to her date last insured. However, although Dr. Perhala has a treating relationship with the claimant, his findings are not consistent with the substantial evidence of record. Further, Dr. Perhala's treatment records (Ex. 11F) and diagnostic testing used to support his diagnosis did not show findings consistent with this level of impairment during the period in question. The claimant's activities of daily living further erode her claims of disabling impairments during this period (i.e., gave birth to two children, performs household chores, drives, and shops in stores). Accordingly, the undersigned finds limited weight appropriate for this opinion (Ex. 14F; 15F).

Tr. 28.

Jirousek acknowledges that Dr. Perhala did not start to treat her until after her date last

insured. Doc. 25, p. 4. Since there was no established treatment relationship prior to the date

last insured, Jirousek has not demonstrated that Dr. Perhala's opinion would be entitled to

controlling weight under the treating physician rule. Also, to the extent that Dr. Perhala's

opinion sheds light on Jirousek's condition prior to her date last insured, the ALJ considered the

opinion and assigned weight to the opinion. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir.

1988) (later dated medical evidence is to be considered to the extent it sheds light on claimant's

condition during the operative time period) ; *Jones v. Comm'r of Soc. Sec.*, 121 F.3d 708, * 1

(6th Cir. 1997) (unpublished) ("Evidence relating to a later time period is only minimally

probative, and is only considered to the extent it illuminates a claimant's health before the

expiration of his or her insured status.") (internal citations omitted); *see also Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (finding evidence obtained after date last insured only minimally probative of claimant's condition prior to date last insured and rejecting claimant's argument that the ALJ's rejection of medical opinion was not supported by substantial evidence).

Moreover, Jirousek has not shown that the ALJ did not sufficiently explain the weight assigned to Dr. Perhala's opinions or that the ALJ's explanation was not supported by substantial evidence. As discussed above with respect to Dr. Potoczak's opinion, the ALJ thoroughly discussed and explained the medical evidence and determined that Dr. Perhala's opinions were not consistent with the medical evidence, including his own findings. For example, in December 2014, Dr. Perhala indicated that Jirousek's inflammatory arthritis was under fair control on Methotrexate and there was normal range of motion and normal motor strength. Tr. 25-26, 538-541, The ALJ also considered that Dr. Perhala's restrictive opinion was not consistent with evidence of Jirousek's activities of daily living. Jirousek challenges the ALJ's consideration of her activities of daily living, arguing that the ALJ mischaracterized the extent of those activities. However, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.

Jirousek also contends that the ALJ erred because she did not mention or properly take into account Dr. Perhala's rheumatological specialty or the nature of the treatment relationship. However, the ALJ did both. The ALJ acknowledged that there was a treating relationship (Tr. 28) but, as indicated, that treatment relationship did not arise until after Jirousek's date last insured. Also, the ALJ acknowledged that Dr. Perhala was an arthritis specialist. Tr. 25.

Jirousek takes issue with the fact that the ALJ did not acknowledge that Dr. Perhala reviewed medical records from other physicians. However, as acknowledged by Jirousek, Dr. Perhala did not review all the medical record evidence for the relevant period. Doc. 25, p. 4. Further, the ALJ considered the entirety of the record and found that the evidence did not support limitations as restrictive as those contained in Dr. Perhala's opinions.

Based on the foregoing, Jirousek has failed to demonstrate reversible error associated with the ALJ's consideration of Dr. Perhala's opinions.

### 3. State agency reviewing physician opinions

In considering the medical opinion evidence, the ALJ considered and weighed the opinions of the state agency reviewing physicians, stating:

> The State agency medical consultant's physical assessment and psychological consultant's mental assessment of "not disabled"[12] dated March 2013 and on reconsideration in July 2013 are given great weight, as the consultants are familiar with the disability program and its requirements. Further, they had the opportunity to review the entire record and their findings were largely consistent with the evidence of record (Ex. 1A; 3A).

Tr. 28.

Jirousek contends that the ALJ's decision to provide greater weight to the opinions of reviewing physicians than his treating physicians was error. The Court disagrees. As discussed above, the ALJ's decision to provide limited weight to the opinions of Dr. Potoczak and Dr. Perhala is sufficiently explained and supported by substantial evidence. Jirousek takes issue with the ALJ providing greater weight to the state agency reviewers' opinions because there was evidence they did not consider, including the treating source opinions offered by Drs. Potoczak and Perhala. Doc. 16, p. 23. The state agency reviewers provided their opinions on March 11,

---

[12] As previously indicated, Jirousek does not challenge the ALJ's decision with respect to her mental impairment claim.

2013, and on July 23, 2013, and their RFC assessments were based on the record at the time of their evaluations. Tr. 75-76, 87-89. Additionally, as reflected in the RFC assessment provided by Dr. Manos, who was the state agency reviewer upon reconsideration, the RFC assessment was provided for the date last insured, i.e., 3/31/2013. Tr. 87. Accordingly, the fact that the state agency reviewers did not have or review evidence post-dating the date last insured is not unexpected. Moreover, the ALJ did review the entirety of the record when weighing the evidence, including later dated treatment records and medical opinion evidence, and found the state agency reviewing physicians' "findings were largely consistent with the evidence of record[.]" Tr. 28; *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence that developed after the issuance of those opinions); *see also Pence v. Comm'r of Soc. Sec.*, 2014 WL 1153704, *13 (N.D. Ohio Mar. 20, 2014) (finding no error where the ALJ explained that weight was given to non-treating physicians' opinions because they were generally consistent with evidence of record and where the ALJ considered relevant evidence that was developed after the issuance those opinions).

Thus, although the ALJ gave more weight to the opinions of the state agency reviewers, the ALJ sufficiently explained the weight assigned to the medical opinion evidence and Jirousek has not shown that the decision is not supported by substantial evidence. Accordingly, the Court concludes that the ALJ did not err in her consideration of and treatment of the medical opinion evidence.

## D.    The ALJ properly assessed Jirousek's credibility

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms.

First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p").[13] "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

The ALJ explained her assessment of Jirousek's credibility stating:

A review of the claimant's work history shows that the claimant had a strong work history as of her alleged onset date. Specifically, a review of the claimant's work history shows she consistently worked since at least 1995. In fact, the year of her alleged onset date she posted $8,100.00 in earnings. Her earnings from 1995 to 2006 ranged from $8,100.00 to $22,112.28. She reported she last "filled in" for her employer in 2009. However, a review of the claimant's work history in 2010 and

---

[13] SSR 16-3p, with an effective date of March 28, 2016, supersedes SSR 96-7p. 2016 WL 1119029 (March 16, 2016); 2016 WL 1237954 (March 24, 2016).

2011 (prior to November 1, 2012, her amended alleged onset date) showed that she had a no work history (i.e. no posted earnings), which raised a question as to whether her inability to work is actually due to her medical impairments. Further, the record showed that the claimant had good activities of daily living and adaptive functioning. She maintained a household, took care of two young children, and completed daily hygiene tasks. The claimant's lengthy work history and her ability to perform activities of daily living without great difficulty tended to bolster the credibility of her ability to sustain regular and continuing work (Ex. 3D-8D).

In assessing the claimant's credibility, the claimant's daily activities are not limited to the extent one would expect given her alleged symptoms and limitations. The claimant alleged that pain "everywhere" restricted her ability to function. Yet she prepared simple meals and did dishes. She lived independently with her family and did household chores such as laundry, light cleaning, and grocery shopping. She had little difficulty managing her own personal care. She could care for her two young children and a pet. The claimant alleged that mental symptoms associated with pain restricted her concentration. However, she went outside, attended her children's school activities, and attended doctor 's appointments without difficulty. She enjoyed watching television, reading, and helping her daughter with schoolwork. She could manage her personal finances without difficulty. She used a computer and email. Thus, her testimony, when coupled with the claimant's daily activities, suggest that her testimony is inconsistent with the longitudinal medical record, and therefore is inconsistent with the above residual functional capacity assessment (Ex. 4E; Cl. Testimony).

Tr. 27.

Jirousek contends that the ALJ mischaracterized the extent to which Jirousek could engage in activities of daily living and, therefore, the ALJ's credibility assessment is flawed. Doc. 16, pp. 23-25.   However, as discussed above, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.

Jirousek also argues that the ALJ improperly considered evidence regarding her work history.  Here, while Jirousek had a lengthy work history for a period of time (Tr. 27 (noting earnings of $8,100.00 to $22,112.28 from 1995-2006), she also did not work for two years prior to her amended alleged onset date (Tr. 27).  "A long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling

impairments." *Hudson v. Astrue*, 2010 WL 4272674, * 6 (E.D. Miss Oct. 25, 2010) (citing *Allen v. Califano,* 613 F.2d 139, 147 (6th Cir.1980)). Nevertheless, "[f]or the same reason, an ALJ may discount a claimant's credibility based upon her poor work record." (citing *Ownbey v. Sullivan,* 5 F.3d 342, 345 (8th Cir.1993) and *Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996); *McClees v. Shalala,* 2 F.3d 301, 303 (8th Cir.1993)). Accordingly, the Court finds that the ALJ properly considered Jirousek's work history when assessing her credibility.

Jirousek also argues that the ALJ's credibility assessment is flawed because the ALJ did not mention that the consultative examining psychologist observed no evidence of exaggeration or fabrication during the evaluation. However, a physician's observations regarding claimant's reliability are not binding upon an ALJ with respect to an ALJ's assessment of a claimant's credibility. Furthermore, an ALJ is not required to discuss every piece of evidence. *See Thacker v. Comm'r of Soc. Sec.*, 99 Fed. Appx. 661, 665 (6th Cir. 2004); *see also Simons v. Barnhart,* 114 Fed. Appx. 727, 733 (6th Cir.2004) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (internal citations omitted).

Based on the foregoing, Jirousek has failed to demonstrate reversible error based on the ALJ's assessment of her credibility.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: May 12, 2017

Kathleen B. Burke
United States Magistrate Judge